# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
1411 K Street, NW, Suite 1300
Washington, D.C.  20005,

HEALTHY GULF,
P.O. Box 2245
New Orleans, LA 70176-2245
                    Plaintiffs,

   v.

U.S. FISH AND WILDLIFE SERVICE,
1849 C Street NW
Washington, D.C.  20240,

MARTHA WILLIAMS, in her official capacity as
Director of the U.S. Fish and Wildlife Service,
1849 C Street NW
Washington, D.C.  20240,

      *and*

DEBRA HAALAND, in her official capacity as
Secretary of the U.S. Department of the Interior,
1849 C Street NW
Washington, D.C.  20240,

                    Defendants.

**<u>AMENDED COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF</u>**

Case No.: 1:22-cv-01877-RDM

## <u>INTRODUCTION</u>

1.      This action challenges Defendants' determination that the eastern black rail (*Laterallus jamaicensis jamaicensis*), an imperiled marsh bird, is not in danger of extinction throughout all or a significant portion of its range, and their failure to designate critical habitat for the species as required under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544. Defendants' determination that the eastern black rail does not warrant endangered status

violates the ESA and contradicts the best available information. Additionally, Defendants' failure to designate critical habitat for the eastern black rail violates their mandatory duty under the ESA, 16 U.S.C. § 1533, and deprives the eastern black rail of vitally important protections that are necessary to ensure the continued survival and recovery of this imperiled species.

2. The eastern black rail is a small, elusive, and vulnerable marsh bird which historically occurred in populations across the eastern half of the United States.

3. Over the last 25 years, its presence has declined by over 90 percent due to threats from habitat loss, degradation, and fragmentation. Now the eastern black rail is thought only to occur irregularly along the eastern coastline, a fraction of the Gulf Coast, and in a very limited number of freshwater wetlands on the Great Plains.

4. In light of the threats facing the eastern black rail's habitat and the species' drastic decline, the U.S. Fish and Wildlife Service ("Service") listed the eastern black rail as "threatened" under the ESA. U.S. Fish and Wildlife Service, Endangered and Threatened Wildlife and Plants; Threatened Species Status for Eastern Black Rail with a Section 4(d) Rule, 85 Fed. Reg 63,764 (October 8, 2020) ("Final Rule").

5. In the Final Rule, the Service disclosed that the entire species will likely be extirpated from the United States by 2068. 85 Fed. Reg. at 63,773. However, the population in the Great Plains will likely be extirpated in just 15 to 25 years. *Id.*

6. The Service determined that the eastern black rail's drastic decline was and continues to be driven by habitat loss from wetland draining and development. *Id.* Specifically, incompatible land practices, wetland conversion, ground and surface water withdrawals, and rising sea levels are the current primary stressors influencing viability of the eastern black rail.

7.    The Service also noted that these stressors, coupled with the predicted sea level rise and increasing storm frequency and intensity will have both a direct and indirect effect on the eastern black rail. 85 Fed. Reg. at 63,794.

8.    The Service's determination that the eastern black rail is "threatened" rather than endangered throughout all or a significant portion of its range is contrary to the best available science and is arbitrary and capricious because the evidence before the agency indicates that the species will be extinct in a significant portion of its range within 15 years and that the species is destined for extinction in less than 50 years throughout its range.

9.    Moreover, the Service's determination that the eastern black rail is not "endangered" in a "significant portion of its range" was never subjected to advanced public notice and comment because it appeared for the first time in the Final Rule.

10.    The Service also failed to designate critical habitat for the eastern black rail. Under the ESA, regardless of whether the Service lists a species as endangered or threatened, it must concurrently designate critical habitat for that species to the maximum extent prudent and determinable. 16 U.S.C. § 1533(a)(3)(A)(i). The ESA only allows the Service to withhold critical habitat designation as "not prudent" in rare instances, 50 C.F.R. § 424.12(a)(1), and only on the basis of the best scientific data available. *Id.* at § 424.12(a).

11.    Here, even though the Service listed the eastern black rail due to significant historical and ongoing threats to its habitat, the Service determined that designating critical habitat for the eastern black rail was "not prudent."

12.    Current regulations state that the Service may determine that critical habitat is "not prudent" when "the species is threatened by taking or other human activity and

identification of critical habitat can be expected to increase the degree of such threat." 50 C.F.R. § 424.12(a)(1)(i).

13. The Service asserted that designating critical habitat would increase the threat from enthusiastic birders who might trample critical habitat and put the eastern black rail at more risk. U.S. Fish and Wildlife Service, Endangered and Threatened Wildlife and Plants; 12-Month Petition Finding and Threatened Species Status for Eastern Black Rail with a Section 4(d) Rule, Proposed Rule, 83 Fed. Reg. 50,610, 50,628 (October 9, 2018) ("Proposed Rule").

14. However, when analyzing the stressors impacting species viability, the Service did not identify birders as a factor that influences the viability of the species. Nor did the Service provide any support for its determination that designating critical habitat would increase the degree of threat allegedly caused by birders. Moreover, the Service failed to provide any historical incidents of birders destroying eastern black rail habitat or otherwise harming the species. Lastly, the Service failed to analyze whether the benefits of designating critical habitat would outweigh any alleged harm caused by birders.

15. Designating critical habitat for this species is vital as habitat loss is the primary driver of the eastern black rail's decline. Protecting habitat will promote the recovery of the eastern black rail and may identify areas that the species currently does not occupy but could in the future should current occupied habitat become destroyed.

16. The Service's "not prudent" determination for eastern black rail critical habitat constitutes a violation of the ESA and the Administrative Procedure Act (APA), 5 U.S.C. § 702, because the Service failed to provide a rational explanation supporting its determination that designating critical habitat would not be prudent given the significant benefit of such determination as recognized by the best available science.

17.     The eastern black rail remains at risk until the Service withdraws its unlawful determination that the species is not endangered and fulfills its mandatory duties to designate critical habitat for this threatened marsh bird. Accordingly, the Center brings this action against the Service to secure declaratory and equitable relief that the Service is in violation of the ESA and the APA.

## JURISDICTION AND VENUE

18.     Plaintiffs brings this action pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), which waives Defendants' sovereign immunity. As required by 16 U.S.C. § 1540(g), Plaintiffs provided Defendants with their notice of intent to sue, which was received by Defendants on March 18, 2021. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. §§ 2201-2202 (declaratory judgments and further relief); 16 U.S.C. §1540(c) (district court jurisdiction); 16 U.S.C. §1540(g)(1)(C) (action arising under the ESA citizen-suit provision); and 5 U.S.C. § 702 (APA).

19.     Venue in this Court is proper pursuant to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e) because this civil action is brought against agencies of the United States, and against officers and employees of the United States acting in their official capacities under the color of legal authority, and because no real property is involved in this action. The Center for Biological Diversity also maintains an office in this judicial district.

## PARTIES

20.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a non-profit organization that is dedicated to the protection of native species and their habitats through science, policy, and environmental law. The Center is incorporated in California and headquartered in Tucson, Arizona, with additional offices in California, Colorado, Florida,

Hawai'i, Nevada, North Carolina, Oregon, Virginia, Washington, Washington, D.C., and La Paz, Mexico. The Center has more than 89,000 active members, including members within the eastern black rail's current and historic range. The Center and its members have a long-standing interest in conserving native species and have consistently advocated for the conservation and protection of native species, including the eastern black rail. The Center submitted the formal ESA petition that has resulted in the eastern black rail gaining some protection under the ESA.

21.     Plaintiff HEALTHY GULF is a non-profit organization based out of Louisiana. Healthy Gulf's purpose is to collaborate with and serve communities who love the Gulf of Mexico by providing research, communications, and coalition-building tools needed to reverse the long-pattern of over exploitation of the Gulf's natural resources. They are committed to protecting and restoring the national resources of the Gulf of Mexico Region, including protecting the eastern black rail and its habitat.

22.     The Center and Healthy Gulf, both organizationally and on behalf of their members, have deep and long-standing interests in the preservation and recovery of imperiled species, including the eastern black rail. To further these goals, the Center and Healthy Gulf support strong and effective protections for the species and has participated in various administrative and legal proceedings and public comment opportunities to protect and recover the eastern black rail.

23.     The Center and Healthy Gulf have members who live near and/or visit areas in and around areas where the eastern black rail was historically present and are currently present, and who have professional, spiritual, aesthetic, scientific, and recreational interests in the conservation and recovery of the eastern black rail and its habitat. These members' interests are being and will continue to be injured by the Service's determination that critical habitat for the

eastern black rail is not prudent. These members include individuals who have visited and plan to continue to visit eastern black rail habitat in the future to pursue their interests in conservation and recovery of the species and its habitat.

24.     One such member resides in Mississippi and has regularly visited, and will continue to regularly visit, tidal marsh habitat in an effort to observe, study, and listen to the eastern black rail. They have a scientific, recreational and personal interest in recovering and conserving this species and its integral role in tidal marsh ecosystems. This member is a former wetland ecologist and regularly conducts bird surveys and guided work in the rail's coastal marsh habitat. They are experienced in observing and listening for coast marsh birds and, even when they cannot view the species, they derive enjoyment from listening for and identifying bird calls, including that of the eastern black rail.

25.     The Center and Healthy Gulf's interest in conserving and recovering the eastern black rail are harmed by Defendants' determination that the species is not endangered and its determination that designating critical habitat for the eastern black rail is not prudent. Specifically, the Center's and Healthy Gulf's organizational interests in conserving and recovering imperiled species and their habitats, and educating members of the public and decisionmakers regarding the benefits of biodiversity and saving life on earth have been and will continue to be injured as the eastern black rail will continue to decline without designated critical habitat. As such, the Service's determination that critical habitat for the eastern black rail is not prudent diminishes the opportunities of the Center, Healthy Gulf, and their members to enjoy the eastern black rail.

26.     The Center and Healthy Gulf also have an interest in the effective and lawful implementation of the ESA. The Center and Healthy Gulf are injured by Defendants'

determination that critical habitat for the eastern black rail is not prudent, which undermines the agency's effective and lawful implementation of the ESA, as well as the conservation of endangered and threatened species.

27.      For these reasons, Defendants' threatened determination and not prudent determination for the eastern black rail has harmed and will continue to harm the Center, Healthy Gulf, and their members' interests. The injuries described above are actual, concrete injuries presently suffered by the Center, Healthy Gulf, and their members and they will continue to occur unless this Court grants relief. These injuries are directly caused by Defendants' actions, and the relief sought herein would redress those injuries. The Center and Healthy Gulf have no other adequate remedy at law.

28.      Defendant UNITED STATES FISH AND WILDLIFE SERVICE is a federal agency within the Department of Interior. The Service has been delegated the responsibility for administering the ESA for terrestrial wildlife including eastern black rail, meeting nondiscretionary obligations under the ESA, and otherwise complying with the ESA.

29.      Defendant MARTHA WILLIAMS is the Director of the United States Fish and Wildlife Service and is charged with ensuring agency decisions comply with law. Director Williams is sued in her official capacity.

30.      Defendant DEBRA HAALAND is the Secretary of the United States Department of the Interior and sued in her official capacity. In this role, Secretary Haaland has the ultimate responsibility for implementation of the ESA, and supervisory authority for the Service.

## STATUTORY BACKGROUND

**The Endangered Species Act**

31.     Congress enacted the ESA in 1973 to provide a "program for the conservation of … endangered species and threatened species" and "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b).

32.     The Supreme Court has declared the ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). As the Court recognized, "Congress intended endangered species be afforded the highest of priorities." *Id.* at 174.

33.     The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." 16 U.S.C. § 1532(3). Thus, the ultimate goal of the ESA is not only to temporarily save endangered and threatened species from extinction but to recover these species to the point where they no longer need ESA protection.

34.     To that end, the ESA requires the Service to protect imperiled species by listing them as "endangered" or "threatened" when they meet the statutory listing criteria. *Id.* § 1533(a)(1).

35.     In making decisions to list or reclassify the status of a species, the ESA requires the Service to "determine whether the species is an endangered species or a threatened species" based on the following statutory factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;

    (C) disease or predation;
    (D) the inadequacy of existing regulatory mechanisms; or
    (E) other natural or manmade factors affecting its continued existence.

*Id.* A species may be listed based on any one or a combination of these five "listing factors."

36. When making listing determinations, the Service must do so "*solely* on the basis of the best scientific and commercial information regarding a species' status," without reference to possible economic or other impacts of such determination. 50 C.F.R. § 424.11(b) (emphasis in original).

37. The ESA defines an "endangered species" as one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

38. A "threatened species" is a species that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20); 50 C.F.R § 424.11(d). The term "foreseeable future" in the definition of "threatened" means "so far into the future as the Service can reasonably determine that both the future threats and the species' responses to those threats are likely." 50 C.F.R § 424.11(d). The Service must apply the "best available data" to construe the "foreseeable future" for a particular species, and consider "the species' life-history characteristics, threat-projection timeframes, and environmental variability." *Id.*

39. The ESA and its implementing regulations protect species that are listed as "endangered" or "threatened" in several ways. For instance: (1) Section 4(f) requires the Secretary, through the Service, to develop a "recovery plan" for each listed species, 16 U.S.C. § 1533(f); and (2) Section 7 requires federal agencies (a) to carry out their programs for the "conservation" of listed species, *id*. § 1536(a)(1), and (b) to avoid activities that are likely to "jeopardize" listed species' continued existence, *id*. § 1536(a)(1)-(2).

40.     However, the ESA provides more stringent substantive protections for endangered species than for threatened species. Endangered species generally receive higher priority for the preparation and implementation of recovery plans, and the Service is more likely to determine that particular actions jeopardize the continued existence of endangered species, leading to better conservation measures under Section 7(a)(2) of the Act.

41.     One of the most crucial protections designed to prevent extinction and aid in the recovery of endangered and threatened species is the determination of a species' "critical habitat." *Id.* § 1533(a)(3)(A).

42.     When the Service lists a species, the ESA mandates the Service to concurrently designate critical habitat for that species "to the maximum extent prudent and determinable," *Id.* § 1533(a)(3)(A)(i), 1533(b)(6)(C), and "solely on the basis of the best available scientific and commercial data available." *Id.* § 1533(b)(2).

43.     Congress defined "critical habitat" to include both areas that are occupied by the species and those that are unoccupied. Occupied critical habitat is defined as "the specific areas within the geographical area occupied by the species … on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." *Id*. § 1532(5)(A)(i). Unoccupied critical habitat means "specific areas outside the geographical areas occupied by the species … upon a determination by the Secretary that such areas are essential for the conservation of the species." *Id*. § 1532(5)(A)(ii). Unoccupied critical habitat may include, for example, areas of abundant food sources and nesting sites that could accommodate new members of a species as its population recovers.

44.     The designation of critical habitat provides mandatory and substantive protections for species' habitat. For example, when the Service designates critical habitat, that area is subject to the interagency consultation requirements of Section 7 of the ESA, *id.* § 1536, which requires all federal agencies to consult with either the Service or the National Marine Fisheries Service to ensure that their actions are not likely to jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat. *Id.* § 1536(a)(2).

45.     Congress has recognized the importance of habitat protections to the conservation and recovery of endangered species. The legislative history of the ESA clearly demonstrates Congress understood the importance of critical habitat designation in conserving listed species:

> [C]lassifying a species as endangered or threatened is only the first step in insuring its survival. Of equal or more importance is the determination of the habitat necessary for that species' continued existence … If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then *the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat.*

H.R. Rep. No. 94–887, at 3 (1976) (emphasis added).

46.     Thus, Congress created a limited exception for circumstances when designation would be "not prudent." *Id.* § 1533(b)(6)(C)(ii).

47.     Legislative history shows that Congress plainly intended the "not prudent" exception to be narrowly applied only where designating critical habitat would not benefit a species. *See, e.g.* H.R. Rep. No. 95-1625 at 16-17 (1978) (designation of critical habitat is not prudent where it "would not be in the interest of the species"); *id.* at 17, (explaining that "[n]ot prudent" determinations are reserved for "rare circumstances where the specification of critical habitat … would not be beneficial to the species").

48.     Prior to 2019, the Service defined the "not prudent" exception to apply to two limited circumstances: (1) where the species is threatened by human activity and identifying

critical habitat would increase that threat; and (2) where doing so "would not be beneficial for the species." 50 C.F.R. § 424.12(a)(1) (2018).

49. In 2019, the Service expanded the "not prudent" exceptions. 50 C.F.R. § 424.1(a)(1) (2019). The regulations now provide five circumstances in which designation of critical habitat might not be prudent:

> (i) The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species;

> (ii) The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or threats to the species' habitat stem solely from causes that cannot be addressed through management actions resulting from consultations under section 7(a)(2) of the Act;

> (iii) Areas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States;

> (iv) No areas meet the definition of critical habitat; or

> (v) The Secretary otherwise determines that designation of critical habitat would not be prudent based on the best scientific data available.

*Id.*

50. The ESA's citizen suit provision provides for judicial review where the Service has failed to perform a mandatory duty under ESA Section 4. 16 U.S.C. § 1540(g)(1)(C).

**The Administrative Procedure Act**

51. Under the APA, a reviewing court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). This standard of review also applies to claims brought under the citizen suit provision of the ESA.

52.     Agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

53.     Under the APA standard of review, the Service must "explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" *Id*. at 52.

## FACTUAL BACKGROUND

54.     The eastern black rail (*Laterallus jamaicensis jamaicensis*) is a small and elusive marsh bird with speckled black plumage, a rufous nape, and eyes that change from red to black with age. U.S. Fish & Wildlife Service 2019, Species Status Assessment Report for the eastern black rail (*Laterallus jamaicensis jamaicensis*) at 5-6 ("SSA").

55.     The eastern black rail is a wetland dependent bird, requiring dense overhead cover and moist soils interspersed with or adjacent to very shallow water. *Id.* at vi. It is found in a variety of salt, brackish, and freshwater marsh habitats in the eastern United States, Mexico, Central America, and the Caribbean. In the United States, eastern black rails occur in both coastal and inland areas, with most detections at coastal sites. *Id.* at 22.

56.     The eastern black rail also uses "ecotones" or transition zones between emergent wetlands and upland grasslands. These transitions areas are critical to the species as they provide refugia during high-water events caused by precipitation or tidal flooding. 85 Fed. Reg. at 63,767.

57.     Eastern black rails are unique in that they are extremely secretive and walk or run under dense vegetation and are rarely seen in flight. 83 Fed. Reg at 50,627. It is very rare to see an eastern black rail; most detections are made by hearing its call. *Id.* at 50,628.

58.     While the eastern black rail once occurred across much of the eastern half of the United States, the population has dramatically declined over the last century. In the last 25 years, the population has declined by over 90 percent, SSA at 25, and are effectively extirpated in New England, the Appalachians, and the central lowlands of the Midwest. *Id.* at 95.

59.     Most of that decline has happened recently; reports indicate that populations have declined by over 75 percent or greater over the past 10 to 20 years. 85 Fed. Reg. at 63,793.

60.     The last remaining populations of the eastern black rail likely occur from New Jersey to Florida, the Gulf Coast to Texas, as well as in some freshwater wetlands on the Great Plains of Kansas and Colorado. Throughout this range, however, the species is irregular and rare. *Id.* at 63,766.

61.     The Service has determined that the eastern black rail will likely be extinct in the United States by 2068. *Id*. at 63,773.

62.     The Service has determined that the Great Plains population of eastern black rails will likely be extirpated in just 15 to 25 years. *Id.*

63.     The principal cause of these past drastic declines and the predicted future drastic declines for eastern black rail populations is habitat loss. *Id.* at 63,796. The Service has determined that due to habitat and population factors, the species' resiliency, redundancy, and representation will continue to decline. 85 Fed. Reg. at 63,794.

64.     It is because of the drastic decline in populations and loss of habitat that, in 2018, the Service proposed to list the eastern black rail as a threatened species ("Proposed Rule"). 83

Fed. Reg. 50,610. However, the Proposed Rule did not make a determination or analyze whether the eastern black rail is endangered in a significant portion of its range.

65. In 2020, the Service issued a final rule listing the eastern black rail as threatened ("Final Rule"). 85 Fed. Reg. 63,764.

66. The Service reports that eastern black rail habitat of emergent wetlands and associated ecotones have experienced significant loss as a result of energy development, agricultural modification, and wetland draining. *Id.* at 63,767-8.

67. The Service recognizes that "despite regulatory efforts to minimize the loss of wetland habitats, losses and alterations of habitats occupied by the eastern black rail continue to occur. Marshes continue to face substantial impacts from dikes, impoundments, canals, altered freshwater inflows … and other … human induced factors. *Id*.

68. The Service discloses that "while conservation measures to protect wetlands have shown meaningful decreases in wetland habitat loss, there remain significant losses of emergent wetlands through the most recent report period. These status and trend reports characterize wetland losses, gains, and conversion to other types of wetlands from all manner of causes, including natural (e.g. storm events) and anthropogenic (e.g. development, oil and gas activities, etc.) means." SSA at 36.

69. Already, over 100 million acres—or approximately 50 percent—of the wetlands in the conterminous United States have been lost over the past two centuries, primarily due to the conversion of wetlands to agricultural lands or urban areas. *Id.*

70. The Service states that threats to wetlands and the eastern black rail habitat include predicted increases in demand for ground water, 85 Fed. Reg at 63,794, and incompatible land management techniques like prescribed fire, haying, mowing, and grazing. *Id.* at 63,793.

71.     The Service acknowledged that climate change, together with wetland loss "limit the ability of the eastern black rail to persist in place or to shift to nearby lightly flooded 'just right' areas as existing habitats are impacted." *Id*. at 63,794.

72.     The Final Rule indicates that these stressors, combined with natural stressors like sea level rise, increase storm frequency and intensity, limit the eastern black rail's ability to persist in place or to shift to new areas when existing habitats are impacted. *Id*.

73.     The Service disclosed that studies project less soil moisture, drier conditions and an increase in frequency, duration, and intensity of drought and severe precipitation events due to climate change. SSA at 60.

74.     The Service acknowledges that habitat loss will continue to be a future risk factor to the eastern black rail. 85 Fed. Reg. at 63,793. "Given that future projections of habitat loss are expected to continue and be exacerbated by sea level rise and tidal flooding, resiliency of the four remaining analysis units is expected to decline further over the next 25 to 50 years. *Id* at 63,794-5.

75.     The Final Rule and the SSA delineated seven analysis units for the eastern black rail based on environmental variables and named them based on topographic and ecological landmarks 85 Fed. Reg. at 63,765.

76.     The seven analysis units for the eastern black rail are: New England, Mid-Atlantic Coastal Plain, Appalachians, Southeast Coastal Plain, Southwest Coastal Plain, Central Lowlands, and Great Plains. *Id.*

77.     The Service has concluded that the New England, Appalachians, and Central Lowlands analysis units are "effectively extirpated." *Id.*

78. The Service found that the loss of these populations coupled with the lack of habitat connectivity has reduced the rail's ability to withstand or recover from catastrophic events. SSA at 98.

79. The "four remaining analysis units," are the Mid-Atlantic Coastal Plain, Southeast Coastal Plain, Southwest Coastal Plain, and the Great Plains. 85 Fed. Reg. at 63,765. These analysis units have records of current populations of eastern black rails. *Id.*

80. The Final Rule states that the four remaining analysis units "have very low occupancy probabilities" and "fairly high site extinction probabilities with accompanying low site persistence." *Id.*

81. The Service predicts a "high probability to complete extinction for all four analysis units" by 2068. *Id.* at 63,773.

82. The Southwest Coastal Plain analysis unit would reach complete extinction in 45-50 years from present. *Id.*

83. The Southeast Coastal Plain and Mid-Atlantic Coastal Plain analysis units may reach complete extinction in 35-50 years from present. *Id.*

84. The Great Plains analysis unit would reach complete extinction in 15-25 years from present. *Id.*

85. Most of these predicated declines are driven by habitat loss. *Id.*

86. The Final Rule states, "Given that most of the predicted declines in eastern black rail occupancy were driven by habitat loss rates, and future projections of habitat loss are expected to continue and be exacerbated by sea level rise or groundwater loss, resiliency of the four remaining analysis units is expected to decline further. *Id.* at 63,774.

87.     In sum, the Service listed the eastern black rail under the Act because of the natural and human caused threats to the species' habitat.

88.     However, despite the Service's conclusion that entire species will be extinct by 2068, with a significant portion of its current range reaching extinction by 2043, the Service determined that the eastern black rail does not warrant endangered status.

89.     The Final Rule determined that the eastern black rail is "threatened" throughout all its range because "current condition of the subspecies still provides for resiliency, redundancy, and representation such that it is not at risk of extinction no throughout its range," 85 Fed. Reg. at 63,794, despite also finding that, "plausible future scenarios of the eastern black rail all predict extirpation for all four analysis units by mid-century (2068) with the Great Plains analysis units potentially becoming extirpated within 15 to 25 years (depending on the scenario)." *Id.*

90.     The Final Rule, for the first time, included an analysis of whether the eastern black rail is endangered or threatened in a significant portion of its range, and determined that the eastern black rail is "threatened" in a significant portion of its range.

91.     When analyzing whether the eastern black rail is endangered in a significant portion of its range, the Final Rule found that "eastern black rail analysis units currently have low to very low resiliency … ." *Id.* at 63,795.

92.     The Final Rule acknowledged that "[t]he Great Plains analysis unit had the shortest time to potential extirpation, forecasting between 15-25 years from the present depending on the scenario." *Id.*

93.     In its SSA, the Service found that the Great Plains analysis area currently has low resiliency and very low occupancy rates and predicted further "large declines in the proportion of the sites occupied in [this analysis area]." SSA at 10.

94.     The SSA states, "In fact, the Great Plains [analysis unit] will *likely* be extirpated in 15-25 years … . By 2068, we expect all eastern black rail [analysis units] to be *likely* extirpated." SSA at x-xi (emphasis added).

95.     The Final Rule determined however that "the one scenario resulting in extirpation within 15 years is a worst-case scenario and is *unlikely* to be an accurate representation of the species viability." 85 Fed. Reg. at 63,796 (emphasis added).

96.     The Service's "significant portion of range" analysis in the Final Rule combined the Mid-Atlantic Coastal Plain analysis area with the Southeast Coastal Plain analysis area.

97.     The Service recognized, "The Mid-Atlantic Coastal Plain [analysis area] currently exhibits very low resiliency for the eastern black rail as it supports fewer birds and occupied habitat patches than the Southeast Coastal Plain [analysis area]." *Id.* at 63,795.

98.     The Service found that the Southeast Coastal Plain analysis area contains a "stronghold" for the species. *Id.*

99.     This analysis and determination that the eastern black rail is not "endangered" in a significant portion of its range was not included in the Proposed Rule. The Proposed Rule expressly did not enter into an analysis regarding whether the eastern black rail is endangered in a significant portion of its range. *See* 83 Fed. Reg. 50,624.

100.    The Final Rule also determined that designating critical habitat for the eastern black rail is "not prudent," despite the acknowledged and significant threat to the species' habitat and thus the species. 85 Fed. Reg. at 63,803.

101.    In the Proposed Rule, the Service determined that designating critical habitat was "not prudent" because it would "likely increase the threat of disturbance to the subspecies … ." 83 Fed. Reg. at 50,628.

102.    The Service claimed that designating critical habitat would cause the species to "face a threat by overzealous birders, and designation can reasonably be expected to increase the degree of these threats … by making location information more readily available." *Id.* at 50,628.

103.    The Service stated that because the eastern black rail is extremely secretive, birders often employ playback calls which can be a "form of harassment to the bird." *Id.* The Service determined that birders attempting to see or hear the bird using recordings "ha[ve] the potential to disturb nesting birds and to trample nests or eggs … ." *Id.*

104.    The Service stated that "the threat of disturbance will be exacerbated by the publication of maps and descriptions outlining the specific locations of this secretive bird in the Federal Register and local newspaper." *Id.*

105.    The Service also claims that the advent of eBird, an online birding tool, has more widely distributed the locations of eastern black rails which will cause "birders [to] often flock to the site in large numbers in an attempt to see or hear the bird." *Id.*

106.    Yet, the Service did not provide any historical incidents of birders destroying eastern black rail habitat or otherwise harming the species.

107.    Further, eBird does not publish locations of sensitive species like the eastern black rail.

108.    Nor did the Service identify birders as a factor that influences the viability of the species when analyzing the stressors impacting the species. SSA at 82.

109.     The best available science does not support the premise that "overzealous birders" are more of a threat to the eastern black rail than destruction of habitat from factors the Service recognizes as a threat to the species viability.

110.     At most, the literature cited by the Service in support of its "not prudent" determination states that birders may impact some species of birds, but that public education and responsible access should ameliorate these impacts.

111.     Also, the Service's conclusion is based on the premise that by designating critical habitat, birders will know "the exact location" of eastern black rails. 83 Fed. Reg. at 50,627. However, there is no evidence in the record that designating critical habitat will result in birders knowing anything more about the location of eastern black rails than they would know in the absence of critical habitat designation. In particular, there is no evidence in the record that eBird would use the critical habitat designation to publish information regarding exact locations of the eastern black rail or its habitat and, in fact, this is not the kind of detailed information that eBird publishes. See < https://ebird.org/species/blkrai >.

112.     Moreover, the Service's SSA and the cited literature already identifies, in detail, the locations of previously identified eastern black rail individuals and breeding pairs. SSA at 27-29.

113.     The course-scale maps published with critical habitat designations do not include exact locations of the species. Therefore, the information regarding locations of eastern black rails available to birders will not increase should the Service designate critical habitat.

114.     The Service did not explain how designating critical habitat will increase the alleged harm caused by birders more than listing the species under the Act would.

115.    Lastly, the Service did not consider any potential benefits of designating critical habitat for the eastern black rail. Habitat loss is the primary threat to the eastern black rail, yet the Service did not explain why alleviating that threat would not be beneficial to the species. Nor, even assuming that critical habitat designation would result in some incremental increase in birders searching for eastern black rails—as to which there is no evidence in the record—did the Service consider whether the statutory and practical benefits of critical habitat designation would outweigh any possible incremental effects.

## FIRST CLAIM FOR RELIEF

### The Service Violated its Non-discretionary Duty to Designate Critical Habitat, in Violation of the ESA.

116.    Plaintiffs hereby incorporates all preceding paragraphs.

117.    The Service has a mandatory duty to designate eastern black rail critical habitat concurrently with its listing decision. 16 U.S.C. §§ 1533(a)(3)(A)(i), (b)(6)(C). The statute authorizes the Service to withhold designation as "not prudent" only in narrow circumstances where designation would not benefit the eastern black rail.

118.    The Service similarly has a mandatory duty to designate eastern black rail critical habitat on the basis of the best scientific data available. *Id.* § 1533(b)(2).

119.    The Service determined that designating critical habitat is "not prudent" based on the unsupported allegation that doing so would cause "overzealous birders" to harm the eastern black rail. This gives unprecedented and unlawful breadth to the "not prudent" exception which cannot be reconciled with Congress's intent.

120.    In determining that designating critical habitat for the eastern black rail was "not prudent," the Service failed to rationally explain how designating critical habitat would harm the

species when habitat destruction from development and land management are the primary factors that lead to listing the species.

121. The Service failed to provide a rational connection between the facts found and the choice made, and failed to provide a reasoned explanation for why designating critical habitat for eastern black rail is "not prudent." The Service's decision not to designate critical habitat based on this application of the "not prudent" exception therefore violates the ESA, and is arbitrary and capricious in contravenes the standard of review in the APA.

## SECOND CLAIM FOR RELIEF (In the Alternative)

### The Service's Application of the "Not Prudent" Exception Violates the APA.

122. Plaintiffs hereby incorporates all preceding paragraphs.

123. Under the APA, a reviewing court "shall … hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

124. In determining that designating critical habitat for the eastern black rail was "not prudent" the Service failed to explain why designating critical habitat puts the eastern black rail at a higher risk when the primary threat to the species is habitat destruction. The Service failed to analyze or disclose whether designating critical habitat could benefit the species.

125. The Service therefore failed to provide a rational connection between the facts found and the choice made and offered an explanation that runs counter to the evidence before the agency. The Service determination is therefore arbitrary and capricious and in violation of the APA. 5. U.S.C. § 706(2).

## THIRD CLAIM FOR RELIEF

### The Service's Failure to List the Rail as Endangered Violated the ESA.

126.    Plaintiffs hereby incorporates all preceding paragraphs.

127.    The Service has a mandatory duty to consider "the best available scientific and commercial data available" when making listing decisions under the ESA. 16 U.S.C. § 1533(b)(1)(A).

128.    The eastern black rail warrants listing as an endangered species because the best available science demonstrates that the species is in danger of extinction through all or a significant portion of its range.

129.    The Service determined that the eastern black rail will be extinct in its entirety by 2068, in just 46 years.

130.    In determining that the eastern black rail warrants listing as "threatened" throughout all its range, the Service ignored and failed to apply "the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), which conclusively shows, as the Service has acknowledged, that the eastern black rail is endangered throughout its range.

131.    The Great Plains population constitutes a significant portion of the eastern black rail's range.

132.    Therefore, the Service determined that the eastern black rail will be extinct in a significant portion of its range by 2043, in just 21 years.

133.    When analyzing whether the eastern black rail is endangered in a significant portion of its range, the Service determined that the species is not in danger of extinction now but will become so in the future and is therefore is a "threatened" species.

134.    The Service's application of the definition of "threatened" is contrary to the ESA because under the Service's logic, a threatened species is one that is likely to become *extinct* in the near foreseeable future.

135.     When analyzing whether the eastern black rail is endangered in a significant portion of its range, the Service improperly combined the Mid-Atlantic Coastal Plain analysis area with the Southeast Coastal Plain analysis area.

136.     The combination of these two analysis areas washes out or diminishes the very low resiliency of the Mid-Atlantic Coastal Plain.

137.     By combining an analysis area that has "very low resiliency" with an analysis area that contains a "stronghold" for the species effectively covers up the dire state of the Mid-Atlantic Coastal Plain eastern black rails and masks the fact that the eastern black rail is endangered in the Mid-Atlantic Coastal Plain analysis area, a significant portion of its range.

138.     The Service's decision to combine these two analysis areas when making its determination that the eastern black rail is not endangered in a significant portion of its range violates the ESA and is arbitrary and capricious.

139.     The Final Rule fails to adhere to the requirement in the ESA that the agency base its listing determinations *solely* on the best available scientific data, 16 U.S.C. § 1533(b)(1)(A), which shows that the species will likely become extinct in all and a significant portion of its range in the foreseeable future due to historic and ongoing habitat destruction and climate change. The Final Rule is therefore not in accordance with the ESA, in contravention of the standard of review in the APA.

**FOURTH CLAIM FOR RELIEF**

**The Service's Listing Determination Violated the APA.**

140.     Plaintiffs hereby incorporates all preceding paragraphs.

141.     The Service determined that the eastern black rail *will* be extinct in its entirety by 2068, in just 46 years and that the eastern black rail in the Great Plains analysis area will be

extinct by 2043, in just 21 years. The Service acknowledges that due to the impacts of climate change, coupled with continued impacts on the species' wetland habitat, it is unlikely that the eastern black rail will be able to persist in current habitats or in nearby potential habitats.

142.    The Final Rule fails to articulate a rational connection between the facts the Service found and the choice it made to classify the species' status and also fails to explain the Service's determination to classify the eastern black rail as "threatened."

143.    The Service is required to provide advance notice and an opportunity to comment on proposed listing decisions, including determinations regarding whether a species is endangered or threatened in a significant portion of its range.

144.    The Service never afforded the public any advanced notice of, or right to comment on, its determination that the species is not endangered in a significant portion of its range because it appeared for the first time in the Final Rule.

145.    This failure to provide the public with advanced notice of its decision constitutes a violation of the Service' procedural obligations under the APA.

146.    Thus, the Final Rule is arbitrary, capricious, an abuse of discretion, and not in accordance with law, 5 U.S.C. § 706(2)(A), in contravention of the APA.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Declare that the Service's decision not to designate critical habitat for the eastern black rail violates the ESA;

B.  Declare that the Service's decision not to designate critical habitat for the eastern black rail violates the APA;

C. Set aside the Service's decision not to designate critical habitat for the eastern black rail;

D. Declare that the Service's decision to not list the eastern black rail as endangered violates the ESA;

E. Declare that the Service's decision to not list the eastern black rail as endangered violates the APA;

F. Direct the Service to propose designating critical habitat and to finalize the proposed designation of critical habitat by a date certain;

G. Remand the Final Rule to the Service to adequately consider listing the eastern black rail as endangered;

H. Direct the Service to keep the Final Rule in place during remand;

I. Award Plaintiffs their reasonable fees, costs, and expenses, including attorney fees and expert witness fees; and

J. Grant Plaintiffs such further and additional relief as this Court may deem just and proper.

DATED this 30th day of August, 2022.

Respectfully submitted,

_Kristine M. Akland_
Kristine Akland (MT Bar No. 13787)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 7274
Missoula, MT 59807
(406)544-9863
Email: kakland@biologicaldiversity.org

John Buse (CA Bar No. 163156
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800

Oakland, CA 94612
(323) 533-4416
Email: jbuse@biologicaldiversity.org

Ryan Adair Shannon (D.C. Bar No. OR0007)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211
(503) 283-5474
Fax: (503) 283-5528
rshannon@biologicaldiversity.org

*Attorneys for Plaintiffs*