## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and HEALTHY GULF, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. FISH AND WILDLIFE SERVICE, *et al.*, <br><br> *Defendants*. | Civil Action No. 22-1877 (RDM) |

## <u>MEMORANDUM OPINION</u>

The Center for Biological Diversity and Healthy Gulf ("Plaintiffs") bring this suit against the U.S. Fish and Wildlife Service, its Director, and the Secretary of the Interior (collectively, the "FWS") under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* ("ESA"), and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). Dkt. 11 (Am. Compl.). This case revolves around the eastern black rail, a rare and elusive marsh bird. Over the past several decades, the eastern black rail population has declined precipitously, and the birds are edging ever closer to extinction. In 2020, the FWS listed the eastern black rail as "threatened" under the ESA, but the FWS declined to protect the birds' "critical habitat" on the grounds that doing so would not be "prudent." *Id.* at 23–27 (Am. Compl. ¶¶ 116–46). Plaintiffs challenge the FWS's failure to designate critical habitat for the eastern black rail. Pending before the Court are the parties' cross-motions for summary judgment. Dkts. 33, 35. For the reasons explained below, the Court will grant Plaintiffs' motion and will deny the FWS's motion.

# I.  BACKGROUND

## A.    Statutory and Regulatory Background

The Endangered Species Act is, in the words of the Supreme Court, "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," affording "endangered species the highest of priorities."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174, 180 (1978).  Its purpose is to conserve "the ecosystems upon which endangered species and threatened species depend" and to "provide a program" to allow species facing extinction to recover.  16 U.S.C. § 1531(b).  The ESA directs the FWS to "list" covered species as "endangered" or "threatened," depending on the "danger of extinction."  *See id.* §§ 1532(6), (20); 1533(a), (b).  Once listed, a species gains a variety of protections.

The ESA recognizes that habitat conservation is an essential element of species conservation.  *Id.* § 1533(a)(1)(A) (providing that the FWS may list a species due to the "destruction, modification, or curtailment of its habitat").  Accordingly, the statute generally protects listed species' "critical habitat[s]," defined as follows:

> (i)  the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii)  specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A).  Section 1533 of the ESA sets forth the process for listing a species as threatened or endangered, including the FWS's obligations with respect to protecting critical habitat.  As relevant here, subsection (a)(3)(A) of § 1533 generally requires the FWS to "designate" critical habitat concurrently with its listing decision:

> The Secretary, by regulation promulgated in accordance with subsection (b) and to the maximum extent prudent and determinable—
>
> > (i)  shall, concurrently with making a determination under [§ 1533(a)(1)] that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat.

*Id.* § 1533(a)(3)(A).  Designated critical habitat gains protection under section 7 of the ESA, which requires federal agencies to "consult[]" the FWS before taking action that could jeopardize designated critical habitat.  *Id.* § 1536(a)(2).  This consultation requirement "is designed as an integral check on federal agency action, ensuring that such action does not go forward without full consideration of its effects on listed species." *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 177–78 (D.C. Cir. 2017) (internal quotation marks omitted).  But the designation of critical habitat does not affect private parties, states, or local governments (except to the extent they are indirectly affected by federal action to which section 7 applies), and it "does not affect land ownership or establish a refuge, wilderness, reserve, preserve, or other conservation area." *Threatened Species Status for Eastern Black Rail with a Section 4(d) Rule*, 85 Fed. Reg. 63764, 63801 (Oct. 8, 2020); *see also Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 10 n.2 (D.C. Cir. 2005) (noting that "[t]he designation of critical habitat has no effect on non-Federal actions taken on private land" (quoting 64 Fed. Reg. 37419, 37428 (1999)).

Although subsection (a)(3) requires, as a general rule, that the FWS designate critical habitat for listed species, it does not require the FWS to extend protection to *all* areas that meet the statute's definition of "critical habitat"—the FWS must only do so "to the maximum extent prudent and determinable."  16 U.S.C. § 1533(a)(3)(A).  In some instances, critical habitat will not be "determinable" because the FWS will not have sufficient information regarding the biological needs of a species to ascertain the location of its critical habitat.  In others, critical

habitat may be determinable, but a designation may not be "prudent."  The ESA does not define

"prudent," but it does require the FWS to consider certain factors in deciding whether to

designate critical habitat.  Subsection (b)(2) of § 1533 provides "the basis" for making critical

habitat designations "under subsection (a)(3)."  *Id.* § 1533(b)(2).  In particular, subsection (b)(2)

provides:

> The Secretary shall designate critical habitat, and make revisions thereto, under
> subsection (a)(3) on the basis of the best scientific data available and after taking
> into consideration the economic impact, the impact on national security, and any
> other relevant impact, of specifying any particular area as critical habitat.  The
> Secretary may exclude any area from critical habitat if he determines that the
> benefits of such exclusion outweigh the benefits of specifying such area as part
> of the critical habitat, unless he determines, based on the best scientific and
> commercial data available, that the failure to designate such area as critical
> habitat will result in the extinction of the species concerned.

*Id.*  In other words, subsection (b)(2) provides the FWS with discretion to exclude critical habitat

if a certain condition is met:  the FWS "may exclude any area" from the designation if it

"determines that the benefits of such exclusion outweigh the benefits of [designation]," unless

the exclusion would result in extinction of the species.  *Id.* § 1533(b)(2).

At the time the FWS issued its proposed rule in this case, its implementing regulations

described when designation of critical habitat is not prudent:

> (1)  A designation of critical habitat is not prudent when any of the
>      following situations exist:
>
>  (i)  The species is threatened by taking or other human activity, and
>       identification of critical habitat can be expected to increase the degree
>       of such threat to the species; or
>
>  (ii) Such designation of critical habitat would not be beneficial to the
>       species.  In determining whether a designation would not be beneficial,
>       the factors the Services may consider include but are not limited to:
>       Whether the present or threatened destruction, modification, or
>       curtailment of a species' habitat or range is not a threat to the species,
>       or whether any areas meet the definition of "critical habitat."

50 C.F.R. § 424.12(a)(1) (2016); *see Implementing Changes to the Regulations for Designating Critical Habitat*, 81 Fed. Reg. 7414, 7439 (Feb. 11, 2016).  Although the FWS has twice amended this regulation since then, the subsection relevant to this case—subsection (i)—has remained unchanged.  *See* 50 C.F.R. § 424.12(a)(1) (2024).  The 2016 version, like the two subsequent versions of the FWS's regulations, moreover, further provided that the agency will make this determination "after taking into consideration the probable economic, national security, and other relevant impacts."  *Id.* § 424.12(a) (2016).  The FWS has consistently recognized, however, that "[c]ircumstances in which [it] determine[s] critical habitat designation is not prudent are rare."  81 Fed. Reg. at 7429.  In promulgating the relevant regulations, the FWS explained that "[m]ost 'not prudent' findings have resulted from a determination that there would be increased harm or threats to a species through the identification of critical habitat," such as an increased risk of poaching.  *Id.* at 7425.  In other cases, "a species may be listed because of factors other than threats to its habitat or range, such as disease."  *Id.*  In those instances, the FWS may conclude that designation would simply increase regulatory burdens without providing any benefit to the species, and, therefore, would be "not prudent."  *Id.*  Nonetheless, the FWS "recognize[s] the value of critical habitat as a conservation tool and expect[s] to designate it in most cases," "especially given that most species are listed, in part, because of impacts to their habitat."  *Id.*

The regulations further provide that, once the FWS makes a critical habitat determination, "[e]ach critical habitat area will be shown on a map, with more-detailed information discussed in the preamble of the rulemaking documents published in the Federal Register."  50 C.F.R. § 424.12(c) (2016).  The FWS must "make the coordinates and/or plot points on which the map is based available to the public."  *Id.* § 424.18(a)(1)(i) (2012).

Because the FWS's general obligation to designate critical habitat is set forth in § 1533 of the ESA, it is enforceable through the ESA's "citizen suit" provision, which authorizes "any person [to] commence a civil suit" against the FWS "where there is alleged a failure of the Secretary to perform any act or duty under section 1533 . . . which is not discretionary with the Secretary."  16 U.S.C. § 1540(g)(1)(C); *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008).

## B.    Factual Background

### 1.    *Eastern Black Rail*

The eastern black rail—a subspecies of black rail—is "a small, cryptic marsh bird" that lives in "salt, brackish, and freshwater wetlands in the eastern United States."  Dkt. 43 at 677. Eastern black rail occupy a unique ecological niche and have "narrow habitat preferences," requiring wetlands with "very shallow water and dense emergent vegetation."  *Id.* at 732.  These conditions are necessary for the birds to build their nests, which must be in "moist soil or shallow water," but sufficiently elevated to be protected from flooding.  *Id.* at 678.  The wetlands must also be adjacent to upland grasslands; these "transitional areas" between the wetlands and grasslands "are critical to eastern black rails, as they provide refugia during high water events." *Id.* at 730.  The birds prefer "dense emergent vegetation" because they seldom fly and, instead, generally "remain on the ground, running quickly" underneath the canopy.  *Id.* at 732, 707.  For this reason, the eastern black rail is considered "secretive" and is rarely observed.  *Id.* at 707. Much about the eastern black rail—its lifespan, breeding frequency, growth and development, migration habits, territorial behavior, and juvenile behavior—remains unknown.  *See id.* at 698– 704.

"Historically, the eastern black rail ranged across the eastern, central, and southern United States," occupying "multiple areas of wetlands." 85 Fed. Reg. at 63765.  Over the last century, however, their range and population have declined precipitously.  *See id.* at 63765–66; *see also* Dkt. 43 at 719.  "Over the past 10 to 20 years, reports indicate that populations have declined by 75 percent or greater."  85 Fed. Reg. at 63793.  As of 2016, the number of breeding pairs in the northeast and southeast United States was estimated to be between 455 and 1,315. Dkt. 43 at 722.  The eastern black rail is "effectively extirpated" in New England, the Appalachian region, and Central Lowlands in the Midwest, *id.* at 681, and the FWS projects that, by 2068, "all eastern black rail[s] . . . are likely to be extirpated," *id.* at 683.

2.     *Causes of the Eastern Black Rail's Decline*

According to the FWS, the "primary threats" to eastern black rail are fourfold: (1) "[h]abitat fragmentation and conversion, resulting in the loss of wetland habitats across the range"; (2) "sea level rise and tidal flooding"; (3) "land management practices," such as "incompatible fire management practices, grazing, and haying/mowing/other mechanical treatment activities"; and (4) "stochastic events," such as "extreme flooding" or "hurricanes."  85 Fed. Reg. at 63767.  All four of these threats are driving extirpation by disrupting the eastern black rail's habitat, although stochastic events and prescribed burns may result in "direct mortality" in addition to habitat destruction.  *Id.* at 63770.

The eastern black rail's habitat—wetlands and associated grasslands—"have experienced significant loss and conversion since European settlement." 85 Fed. Reg. at 63767. "Approximately 50% (greater than 100 million acres) of the wetlands in the conterminous United States have been lost over the past 200 years," including "most of the native grassland/prairie habitats associated with eastern black rail habitat." *Id.* This loss is largely attributed to

"development," "agricultural conversion," and other human activities.  *Id.* at 63767–69 (explaining that "excavation of drainage ditches, channelization of rivers and streams, construction of levees and berms, tidal restrictions, and diversions of waterways" have "expos[ed] eastern black rails to unsuitable water regimes or converted habitats").  Similarly, sea level rise and associated flooding "will reduce the availability of suitable habitat for the eastern black rail and overwhelm habitat persistence."  *Id.* at 63769.  Human activities such as fire management (both suppression and prescribed burns) and grazing, haying, or mowing also jeopardize essential features of the eastern black rail's habitat.  All of these land management practices may "reduce[] the wetland vegetation canopy cover" or otherwise alter wetland vegetation.  *Id.* at 63769–70.  Stochastic events, for their part, "cause significant damage to coastal habitats by destroying vegetation and food sources" for the eastern black rail.  *Id.* at 63770–71.

       3.    *Effects of Birding*

In addition to these four "primary threats," the FWS identified disturbances from "birders" as a "concern" for the eastern black rail.  85 Fed. Reg. at 63767.  In general, "[h]uman disturbance can stress wildlife," and "[a]ctivities such as birding and hiking[] have been shown to disturb breeding and nesting birds."  *Id.* at 63771.  As for the eastern black rail in particular, its "rarity" makes it "highly sought after by birders" hoping to add it to their birding "life list." *Id.*  Although birders generally "play an especially important role in contributing to citizen science efforts," some birders may be "overzealous" in their pursuit of rare birds, such as the eastern black rail.  *Id.* at 63771, 63802.  Birders may use "playback calls of eastern black rail vocalizations in attempts to elicit responses from the birds" or "approach[] [the] birds in order to get a sighting," which "can . . . result in trampling of the bird's habitat, as well as of eggs and

nests." *Id.* at 63771.  The American Birding Association's Code of Birding Ethics, however, discourages use of playback calls, and "most birders likely follow these ethical guidelines."  *Id.* In addition, "[v]ery serious birders" will go out of their way to observe an eastern black rail, but because the birds are perceived as "not the least bit charismatic and not particularly attractive," birders are "unlikely to go out of the way" to observe them more than once.  Dkt. 43 at 665.

The FWS has, nonetheless, identified the following instances of birders gathering to see the eastern black rail.  In 1989, "a dozen birders" reportedly entered a marsh in New Jersey to "search for Black Rails," using "tapes to lure" the birds out.  Dkt. 43 at 32.  In 1991, a "small group of Colorado's birding elite, say 15 people," assembled to observe "Black Rail."  Dkt. 43 at 33.  One birder "pruned a portion of the marsh" to allow the others to see and played a "tape of a Black Rail."  *Id.*  In 2008, other birders "trampled" some areas of a marsh in an effort to observe "black rails" in Ohio.  *Id.* at 305.  In June 2010, an eastern black rail was reported in Massachusetts.  This sighting, which was posted on eBird, a popular birding application, drew dozens of birders hoping to see or hear the bird.  *See id.* at 197; *12-Month Petition Finding and Threatened Species Status for Eastern Black Rail with a Section 4(d) Rule*, 83 Fed. Reg. 50610, 50628 (Oct. 9, 2018).  And in 2015, "four birders" attempting to find the birds in South Carolina entered an area that had been "marked closed" to protect the birds' nests.  Dkt. 43 at 204.  Aside from these specific incidents, many birders have reported observing the eastern black rail over the years on eBird, and "a few cases of trespassing are known" to have occurred.  *Id.* at 396.

Birders may, at times, disturb the birds and trample parts of their habitat, but there is no evidence of bird or egg mortality from birders.  Moreover, although birders were previously able to publicly post the location of eastern black rail sightings on eBird, in 2019, as the FWS has recognized, eBird added the eastern black rail to its list of "sensitive species."  85 Fed. Reg. at

63780.  As a result, users are no longer able to publicly post data or location records relating to

an eastern black rail sighting on eBird.  83 Fed. Reg. at 50628.

## C.  Regulatory History

The decline of the eastern black rail prompted Plaintiff Center for Biological Diversity to

petition the FWS in 2010 to list the subspecies as threatened or endangered.  Dkt. 43 at 692.  The

FWS eventually committed to publishing a proposal in the Federal Register by 2018, and,

accordingly, initiated a "Species Status Assessment (SSA) to compile the best available data

regarding the subspecies' biology and factors that influence the subspecies' viability."  *Id.*  The

SSA used dynamic occupancy modeling to project the birds' viability until the year 2100.  *Id.* at

792.  Each forecasted scenario adjusted the severity of the "three primary risks" affecting the

birds' viability: "[1] habitat loss, [2] sea level rise (or groundwater loss), and [3] land

management (grazing, fire, and haying)" to determine the impact of each threat on the

subspecies' survival.  *Id.*  In every scenario, including one that assumed "a *lower* rate of habitat

loss in the future," the model "predicted high probability of complete extinction . . . by 2100."

*Id.* at 793 (emphasis added).  "Most" of the projected decline was "driven by habitat loss rates

that were input into each scenario."  *Id.* at 794.

After completing the SSA, the FWS proposed listing the eastern black rail as

"threatened" under the ESA.  83 Fed. Reg. 50610.  The FWS "determined that habitat loss and

destruction, sea level rise and tidal flooding, incompatible land management, and increasing

storm intensity and frequency are the primary threats to this subspecies," and that these threats

were sufficiently severe to warrant listing under § 1533.  *Id.*  But the proposed rule explained

that, notwithstanding the risk posed by habitat loss, the FWS "determined that designation of

critical habitat for the eastern black rail is not prudent."  *Id.*  The FWS reasoned that because

designating critical habitat requires "the publication of maps," a designation "would more widely announce the exact location of eastern black rails (and highly suitable habitat) to overzealous birders and further facilitate disturbance." *Id.* at 50627.

According to the proposed rule, the FWS based its "not prudent" determination on 50 C.F.R. § 424.12(a)(1)(i), *see id.*, which, as noted above, provides that the designation of a critical habitat is not prudent when "[t]he species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species." The FWS concluded that, under that regulatory provision, "[a] finding that designating critical habitat is likely to increase the threat of disturbance to the subspecies provides a sufficient basis for making a not-prudent finding," and the FWS is "not require[d] also [to] determine that designating critical habitat would not be beneficial to the subspecies." *Id.* at 50628. In other words, the FWS read § 424.12(a)(1)(i) to permit it to make a "not prudent" determination whenever the designation of a critical habitat is likely to increase human activity that may disturb the subspecies, even when the benefits of designation vastly outweigh the damage caused by that increased activity.

The FWS published its final rule in 2020, listing the eastern black rail as a threatened species under the ESA. 85 Fed. Reg. at 63764. The final rule also adhered to the FWS's proposal to not designate any critical habitat, despite comments it received in opposition. *Id.* In response to those comments, the final rule "recognize[d] that designation of critical habitat can provide benefits to listed species," and it did "not dispute the arguments of the commenters who suggested that birders may have enough information to be able to locate eastern black rail populations, particularly given the use of social media." *Id.* at 63780. But the agency, nonetheless, asserted its view that the "increased threats caused by designation" of critical habitat

for the eastern black rail "outweigh the benefits," because designation "would more widely publicize [the] known occupied locations of the" subspecies.  *Id.*  The sole support and analysis the FWS offered, however, consisted of a citation to the proposed rule's "discussion" regarding overzealous birders.  *Id.*  Beyond that limited discussion, the FWS merely stated that it "did not receive any substantive comments, or any comments that would require [the FWS] to change the not prudent determination or [the] rationale for it."  *Id.* at 63802 (citing 83 Fed. Reg. at 50627–28).

The FWS accordingly concluded that "designation of critical habitat is not prudent, in accordance with 50 C.F.R. 424.12(a)(1), because the eastern black rail and its habitat face a threat by overzealous birders, and designation can reasonably be expected to increase the degree of these threats to the subspecies and its habitat by making location information more readily available."  *Id.*

### D.    Procedural Background

Plaintiffs filed this suit against the FWS, challenging both the listing of the eastern black rail as a threatened species (rather than endangered) and its determination that designation of critical habitat is not prudent.  Dkt. 11 at 1–2 (Am. Compl. ¶ 1).  The FWS filed a motion for partial voluntary remand without vacatur regarding the listing determination to permit the agency to reconsider and to explain further its listing decision, Dkt. 21, which the Court granted, Dkt. 26.  As a result, the only issue before the Court is Plaintiffs' challenge to the FWS's decision not to designate critical habitat.  The parties cross-move for summary judgment.  Dkts. 33, 35.

## II.  LEGAL STANDARD

Plaintiffs' claims arise under the ESA, but because "the ESA does not specify a standard of review, judicial review is governed by [§] 706 of the [APA]."  *Gerber v. Norton*, 294 F.3d

173, 178 n.4 (D.C. Cir. 2002) (citation omitted).[1]  Under that section, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or decisions made "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

In the unique context of review under the APA, the district court "sit[s] as an appellate tribunal," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222 (D.C. Cir. 1993), to decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review," *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011).  Where a party challenges an agency's interpretation of a statute, the Court must decide "all relevant questions of law" *de novo*, "exercising independent judgment in determining the meaning of statutory provisions."  *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262, 2272 (2024) (quoting 5 U.S.C. § 706).  In doing so, the Court must "apply[] all relevant interpretive tools" to reach "the best reading of the statute."  *Id.* at 2266.

## III.  ANALYSIS

### A.    Standing

Although the FWS does not contest Plaintiffs' standing, the Court has an independent duty to ensure that it has jurisdiction over each claim before turning to the merits.  *See Maalouf v. Islamic Rep. of Iran*, 923 F.3d 1095, 1107 (D.C. Cir. 2019).  Plaintiffs must meet the three

---

[1] Plaintiffs also allege, in the alternative, that the FWS violated the APA. Dkt. 11 at 24 (Am. Compl. ¶ 125).  But "the APA by its terms independently authorizes review only when 'there is no other adequate remedy in a court,'" *Bennett v. Spear*, 520 U.S. 154, 161–62 (1997) (quoting 5 U.S.C. § 704), and "[h]ere, the ESA's citizen-suit provision provides an adequate remedy," *Conservation L. Found. v. Ross*, 422 F. Supp. 3d 12, 16 (D.D.C. 2019) (cleaned up).  Thus, although APA precedent provides the standard of review, the Court will not separately address Plaintiffs' APA claims.

elements of the "irreducible constitutional minimum of standing"—that is, they must "show (1) an injury in fact that is 'concrete and particularized' and 'actual or imminent'; (2) that the injury is fairly traceable to the defendant's challenged conduct; and (3) that the injury is likely to be redressed by a favorable decision." *Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  Although an association may rely on either organizational or associational standing, Plaintiffs appear to rely only on associational standing.  *See* Dkt. 33 at 25 n.2.  To establish associational standing to sue under Article III, a plaintiff-association must demonstrate that "(1) at least one of its members would have standing to sue in his own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit."  *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (internal quotation marks and citation omitted).

Here, the second and third requirements for associational standing are easily satisfied. With respect to the second requirement, Plaintiff Center for Biological Diversity is a non-profit organization "dedicated to the protection of native species and their habitats through science, policy, and environmental law," *see* Dkt. 11 at 5 (Am. Compl. ¶ 20), and Plaintiff Healthy Gulf is a non-profit organization "committed to protecting and restoring the national resources of the Gulf of Mexico Region, including protecting the eastern black rail and its habitat," *id.* at 6 (Am. Compl. ¶ 21).  The interest at stake in the litigation—the designation of critical habitat for the eastern black rail—is germane to Plaintiffs' missions.  And, with respect to the third requirement, the claims at issue do not demand the participation of any member of the organizations.  The relief Plaintiffs seek—an order declaring the agency action unlawful and vacating that action—does not differentiate between their members.

The Court also concludes that the first requirement is satisfied because at least one member of the organizational Plaintiffs would have standing to sue in his or her own right. As the D.C. Circuit has observed, injury to "an aesthetic interest in the observation of animals" resulting from "government action that allegedly threatened to diminish the overall supply of an animal species" is generally sufficient to establish standing. *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 437 (D.C. Cir. 1998). "[T]he causation requirement for constitutional standing is met when a plaintiff demonstrates that the challenged agency action authorizes the conduct that allegedly caused the plaintiff's injuries," and plausibly alleges that the agency action was unlawful. *Id.* at 440. And a court order vacating the challenged action (or remanding the case to the agency for further consideration of that action) will generally redress the alleged injury. *See id.*; *Lujan*, 504 U.S. at 572 n.7.

Both Plaintiffs in this case have members who are suffering, and will continue to suffer, an injury-in-fact from the decline of the eastern black rail. Many of Plaintiffs' members "live near and/or visit areas in and around areas where the eastern black rail was historically present and are currently present, and who have professional, spiritual, aesthetic, scientific, and recreational interests in the conservation and recovery of the eastern black rail and its habitat." Dkt. 11 at 6 (Am. Compl. ¶ 23). These allegations are supported by declarations from three individual members of the organizational Plaintiffs, which establish that those members have such interests in the continued existence of the subspecies in the wild and the conservation of its habitat. *See* Dkt. 33-1 at 2–4 (Allaire Decl. ¶¶ 3–7, 11–13); Dkt. 33-2 at 2, 4–5 (Hartl Decl. ¶¶ 5, 11, 13); Dkt. 33-3 at 2–4 (LaSalle Decl. ¶¶ 6, 9, 12–14). Plaintiffs also plausibly allege that the FWS's failure to designate critical habitat for the eastern black rail has caused, and will continue to cause, their members to suffer redressable injuries. In making that assessment, the Court must

"accept as valid the merits of [the plaintiff's] legal claims," *FEC v. Cruz*, 596 U.S. 289, 298 (2022), so the Court must assume for present purposes that the FWS's critical habitat determination was unlawful. Against that backdrop, Plaintiffs plausibly allege that the FWS's action has decreased, and will continue to decrease, the eastern black rail's chances of survival and recovery.

One of Plaintiffs' members holds a Ph.D. in zoology with an emphasis on wetland ecology. Dkt. 33-3 at 2 (LaSalle Decl. ¶ 5). He explains that the eastern black rail's habitat in his home state—"high marsh and salt flats within the tidal system"—is "under threat," and absent protection for those areas, "the eastern black rail populations will continue to decline at alarming rates." *Id.* at 4 (LaSalle Decl. ¶¶ 11, 15). He further attests that he has and "will continue to visit areas where eastern black rails have been reported" in the course of his "continuing efforts to document them and associat[ed] species, as part of [his] inventory activities." *Id.* (LaSalle Decl. ¶ 12); *see also id.* at 2 (LaSalle Decl. ¶ 6) ("I use and have used such habitats recreationally and professionally. I have visited areas presently occupied by the eastern black rail on many occasions and plan to again in the near future.").

Another member attests that he personally derives scientific and professional "benefits from the continued existence of the eastern black rail"; that he has seen the bird "in its natural habitat on [his] property twice in the last three weeks"; that he has visited a sanctuary in the hope of hearing or seeing "an eastern black rail" and plans to visit the sanctuary "on a monthly basis during the spring neo-tropical bird migration this year"; that "[i]f the [FWS] does not designate critical habitat, the eastern black rail populations will continue to decline," which will "lessen [his] opportunities . . . to hear or observe this subspecies in the wild"; and that his "professional, aesthetic, spiritual, and recreational interests in the eastern black rail's existence in the wild are

substantially injured by denial of critical habitat protections for the eastern black rail."  Dkt. 33-1 at 2–4 (Allaire Decl. ¶¶ 4–6, 10, 12–13).

And yet a third member attests that he is an avid birder and amateur naturalist, who has "traveled around the world" and spent "hundreds of hours every year" observing as many species of birds as possible.  Dkt. 33-2 at 2–3 (Hartl Decl. ¶¶ 5, 7).  He has taken several trips, in particular, "to attempt to view . . . eastern Black Rail in eastern Maryland in and around Blackwater National Wildlife Refuge," *id.* at 4 (Hartl Decl. ¶ 11), and in California and Arizona along the Colorado River, *id.* (Hartl Decl. ¶ 12).  He also visited Texas in 2019 "to observe birds including the Black Rail," and, "[m]ost recently, [he] spent several days along the Texas coast near Mustang Island State Park in April 2024, and again tried to view a Black Rail," and he plans on continuing his efforts "to view Black Rails in the future."  *Id.* at 5 (Hartl Decl. ¶ 13).  He further attests that he has "been and continue[s] to be injured by the Fish and Wildlife Service's failure to fully protect the Black Rail by designating critical habitat for the species," because this failure has diminished his "chances of seeing Black Rail."  *Id.* at 7 (Hartl Decl. ¶ 18).

These members' injuries are cognizable under settled D.C. Circuit precedent, *see Glickman*, 154 F.3d at 437, and they are redressable, because an order vacating and remanding the FWS's decision could cause it to reverse course and extend protection to eastern black rail habitat, *see Lujan*, 504 U.S. at 572 n.7.  The Court, accordingly, concludes that Plaintiffs have met their burden of establishing standing to sue.

**B.     ESA Claim**

Plaintiffs challenge the FWS's "not prudent" determination as inconsistent with the agency's obligations under the ESA.  They contend that the ESA requires the FWS to consider the benefits of critical habitat designation and to weigh those benefits against any costs before concluding that designation would be "not prudent," and they contend that the FWS never

engaged in this required analysis before making the "not prudent" determination in this case. This error, Plaintiffs posit, is all the more alarming (and irrational) given that the FWS identified habitat loss—rather than "birders"—as the primary driver of the subspecies' decline.

In response, the FWS argues that the ESA does "not require[] [it] to weigh benefits when making its 'not prudent' determination," and that, in any event, the FWS "considered" the benefits in its proposed and final rules. Dkt. 42 at 12–13. The Court will address each argument in turn.

1.    *Weighing the Benefits of Designation*

Plaintiffs first maintain that the FWS's "not prudent" determination was based on a misreading of the ESA. On Plaintiffs' reading of the statute, the FWS must make certain findings under § 1533(b)(2) before it can invoke the "not prudent" exception under § 1533(a)(3). Dkt. 33 at 40. Plaintiffs interpret subsection (b)(2) as requiring the FWS to weigh the pros and cons of designating critical habitat: FWS must first "determine[]" whether designation would benefit a listed species. 16 U.S.C. § 1533(b)(2). If so, it must then weigh those benefits against the benefits of *not* designating critical habitat, taking biological and non-biological factors into consideration. If (and only if) the benefits of not designating outweigh the benefits of designating, "may" the FWS decline to designate critical habitat. *Id.*

The FWS disagrees, asserting that the pros-and-cons analysis set forth in subsection (b)(2) is "inapplicable" to its "not prudent" determination under subsection (a)(3). Dkt. 42 at 10. According to the FWS, subsection (b)(2) "only applies when the Service first determines that designating critical habitat is prudent [under subsection (a)(3)] and then exercises its discretion to exclude specific areas from that critical habitat designation." *Id.* (emphasis in original). As support for this interpretation, the FWS observes that subsection (b)(2) permits the FWS to

18

"exclude any area" from critical habitat after weighing the pros and cons of doing so.  The FWS reasons that, because it "did not designate critical habitat *at all*" for the eastern black rail (as opposed to excluding only "specific areas"), the balancing requirement in subsection (b)(2) "do[es] not apply."  Dkt. 35-1 at 30 n.13 (emphasis added).  With subsection (b)(2) out of the way, the FWS then interprets its implementing regulations as providing the agency with authority to decline to designate any critical habitat so long as it finds that designation would increase a threat (here, the threat posed by birders) to the species.  Dkt. 42 at 9–10.  In the FWS's view, then, "[n]either the statute nor the implementing regulations require the Service to weigh the benefits of designating critical habitat"; the agency may decline to designate critical habitat as "not prudent" without making any finding whatsoever regarding whether doing so would, on balance, help or hurt the species.  *Id.* at 10.

The FWS's position is at odds with both the text and structure of the ESA.  To start, the FWS's reading of the statute disregards the statutory text that expressly ties the subsection (a)(3) designation determination to the subsection (b)(2) balancing requirement.  In a show of legislative emphasis, the text cross-references subsection (b)(2) in subsection (a)(3)(A)— requiring the FWS to make the critical habitat designation "in accordance with subsection (b)"— and, then, cross-references subsection (a)(3) in subsection (b)(2)—requiring the FWS to "designate critical habitat, and [to] make revisions thereto, under subsection (a)(3) on the basis of the" criteria specified in subsection (b)(2).  *See* 16 U.S.C. § 1533(a)(3), (b)(2).  If that were not enough, the FWS's theory—that the balancing required under subsection (b)(2) applies before it can exclude "any" critical habitat but does not apply where it decides to exclude "all" critical habitat, Dkt. 35-1 at 30 n.13—is also unmoored from the plain meaning of the word "any."  If a child needs to eat her vegetables before taking "any" cookies, surely, she also needs to do so

before taking "all" the cookies.  Likewise, because subsection (b)(2) requires the FWS to weigh

the relevant benefits (including the benefits of designation) before excluding "*any* area from

critical habitat," 16 U.S.C § 1533(b)(2) (emphasis added), it also requires the FWS to weigh

those same benefits before excluding *all* areas from critical habitat.

Nor does the FWS's reading of the statute give meaning to the requirement that the

Secretary designate critical habitat to "the maximum extent prudent."  *Id*. § 1533(a)(3)(A).  The

word "prudent" connotes "sound judgment," "cautio[n]," and far-sighted[-ness]."  *Prudent*,

Oxford English Dictionary 1382 (2007).  Read in context, this means that the FWS "shall"

designate critical habitat to the "maximum extent" that it can do so, consistent with sound

judgment, caution, and foresight.  It is difficult to fathom how the agency could possibly act in

that considered manner, or how it could possibly satisfy the "maximum extent" requirement,

without considering the net benefits of making a designation.  Yet, on the agency's telling, the

Secretary can—and should—decline to make a critical habitat designation if doing so carries

with it *any* downside, even if the upside of making the designation outweighs the downside by a

factor or two, ten, or hundred.  Or, to put it more concretely, under the FWS's reading of the

statute, the Secretary should decline to designate a critical habitat if doing so will likely result in

the loss of a single bird due to overzealous birders, even if the designation will also likely save a

hundred birds by protecting essential habitat.  Although one might reasonably question whether

Congress could possibly have intended such a bizarre result, a far a simpler answer is available:

the ESA "means what it says," *Banks v. Booth*, 3 F.4th 445, 449 (D.C. Cir. 2021), and the statute

says that the FWS "shall" designate critical habitat "to the maximum extent prudent" and may

exclude "any"—or "all"—"area from critical habitat [only] if [it] determines that the benefits of

such exclusion outweigh the benefits of" making the designation, *see Nat. Res. Def. Council v.*

*U.S. Dep't of the Interior*, 113 F.3d 1121, 1125 (9th Cir. 1997) (holding that subsection (b)(2) requires the FWS to "balance the pros and cons of designation" before making "not prudent" determinations under subsection (a)(3)).

Finally, not only is the FWS's argument at odds with the text and common sense, but it also violates the cardinal rule that Congress "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).  In subsection (b)(2), Congress precisely delineated "the basis" upon which the FWS must designate (or may decline to designate) critical habitat.  A designation "shall" be based on "the best scientific data available," and the FWS must consider economic, national security, and other relevant impacts.  16 U.S.C. § 1533(b)(2).  Subsection (b)(2) then starts with the presumption that the FWS will designate critical habitat; it "may" decline to do so if, and only if, it "determines that the benefits of such exclusion outweigh the benefits of [designation]."  *Id.*  In other words, designation is the rule, and the FWS may forgo a designation, in whole or in part, only after making these findings.  *See Bennett v. Spear*, 520 U.S. 154, 172 (1997) (holding that subsection (b)(2) sets forth "required procedures of decisionmaking" with respect to critical habitat designations).  Yet the interpretation the FWS presses here—"<u>first</u>" deciding whether designation is "prudent" under subsection (a)(3) and, if so, "<u>then</u>" weighing the benefits under subsection (b)(2), Dkt. 42 at 10 (emphasis in original)—would upend this scheme.  The FWS could "first" decide—unconstrained by any meaningful statutory standard—to exclude all critical habitat, thereby avoiding the pros-and-cons analysis required by subsection (b)(2).  The FWS offers no reason to infer that, by including the word "prudent" in subsection (a)(3), Congress "alter[ed] the fundamental details" of this analysis and gave the FWS sweeping discretion to decline to

designate critical habitat, even when the designation would help preserve or restore the threatened or endangered species. *Whitman*, 531 U.S. at 468.

The Court, accordingly, concludes that the ESA requires the FWS to identify the benefits of designation to the species before deciding to exclude any or all areas of the species' critical habitat.[2]

2.      *"Not Prudent" Determination*

The FWS argues, in the alternative, that it *did* weigh the benefits of designation for the eastern black rail. Dkt. 35-1 at 30. This contention, however, is belied by the record. There is no evidence that the FWS meaningfully weighed the benefits of designation in accordance with subsection (b)(2). After cataloguing the threats to the eastern black rail's habitat at length, the proposed rule contains no discussion of whether or to what extent the birds would benefit from a critical habitat designation, and it concludes by expressly disclaiming the FWS's obligation to make such a determination prior to excluding all critical habitat. *See* 83 Fed. Reg. at 50628. In the words of the proposed rule:

> Under our regulations at 50 C.F.R. 424.12(a)(1)(i), th[e] finding that designating critical habitat is likely to increase the *threat of disturbance* [*i.e.*, human activity, such as birding] to the subspecies provides a sufficient basis for making a non-prudent finding. As demonstrated by the use of the word "or" in 50 C.F.R.

_____

[2] The Court notes that the FWS relied in part on its regulations when it declined to designate critical habitat, *see* 83 Fed. Reg. at 50628, and, as explained below, the Court concludes that its decision violated the ESA. Although courts typically "defer to an agency's interpretation of its own regulation," *Doe v. SEC*, 28 F.4th 1306, 1311 (D.C. Cir. 2022), regulations must be interpreted as "consistent with the statute under which they are promulgated," *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013) (citation omitted). To the extent the FWS interpreted its regulation as authorizing it to withhold critical habitat designation for the eastern black rail merely because the designation could increase the threat to the subspecies caused by birders, and regardless of whether the designation would yield a net benefit to the subspecies, that interpretation is inconsistent with the ESA and must be set aside. *See Loper Bright Enters.*, 144 S. Ct. at 2262, 2272. But because the FWS's statutory violation is sufficient to require vacatur and remand, the Court need not resolve the meaning of the regulation or whether it is valid as written.

> 424(a) between subsections (1)(i) and (i)(ii), *the regulations do not require that we . . . determine that designating critical habitat would not be beneficial to the subspecies*.

*Id.* (emphasis added).  That is the entirety of the discussion of "Benefits to the Subspecies from Critical Habitat Designation" found in the proposed rule.  *Id.*

Following publication of the proposed rule, the FWS received some comments in opposition to its proposed "not prudent" determination.  The National Audubon Society, for example, commented that "habitat loss" was the primary cause of the birds' decline, and "the benefit [of] critical habitat designation far outweighs the risks from disturbance" from birders.  Dkt. 43 at 591–92.  The FWS concedes as much, moreover, in its motion for summary judgment in the present proceeding.  Dkt. 35-1 at 28 ("[T]he Service identified the primary stressors anticipated to affect the subspecies: habitat loss, sea-level rise, groundwater loss, and incompatible land-management practices[.]").  Yet in response to these comments, the final rule merely cited to the proposed rule's "discussion," 85 Fed. Reg. at 63780, and stated, in conclusory terms, that "designation of critical habitat can provide benefits to listed species" but that, "for the eastern black rail, increased threats caused by designation outweigh the benefits," Dkt. 35-1 at 31.  Neither the proposed nor the final rule, however, contains even a single sentence analyzing this question.  Nor is there any plausible basis to infer on this bare record that the risk caused by birders, which is not listed as a "primary stressor" outweighs habitat loss, which is listed first among the "primary stressors."

The FWS maintains that because it "requested comments" on the topic and responded in the manner quoted above, its discussion was "more than sufficient" to show that it considered the benefits, and that it accordingly was entitled to exclude all critical habitat.  Dkt. 35-1 at 30–31.  The Court is unpersuaded.  "When a statute requires an agency to make a finding as a

prerequisite to action, it must do so," and merely "'[s]tating that a factor was considered'—or found—'is not a substitute for considering' or finding it." *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (quoting *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986)); *see Getty*, 805 F.2d at 1057 (holding that "fleeting references" to statutory factors were insufficient to show that agency "consider[ed]" those factors). Nor may an agency "delegate" its obligation to consider certain issues or make certain findings to commenters. *Cf. Gerber*, 294 F.3d at 185. Here, there is no evidence that the FWS ever considered whether critical habitat designation would provide a net benefit to the eastern black rail. FWS's conclusory assertion that designation "can provide benefits to listed species" but that any benefits to the eastern black rail were "outweigh[ed]" is far from sufficient. 85 Fed. Reg. at 63780; *see Getty*, 805 F.2d at 1057. To be sure, the FWS noted that birders were cause for "concern," 83 Fed. Reg. at 50616, but the FWS never suggested that birders are driving the eastern black rail to extinction, nor do the cited incidents of "human disturbance" show that birders cause harm that is in any way comparable to the magnitude of harm caused by habitat loss. *See* 85 Fed. Reg. 63771. In any event, a finding that critical habitat designation could "increase the degree" of one type of threat, *id*. at 63802, is not the same as a finding that designation would provide no net benefits.

As explained above, the ESA requires the FWS to designate critical habitat "concurrently with making a determination" to list a species or subspecies. 16 U.S.C. § 1533(a)(3)(A)(i). It "may" decline to do so if it finds that the costs outweigh the benefits, rendering the designation imprudent. *Id.* § 1533(a)(3)(A), (b)(2). Because the FWS excluded all critical habitat without making any findings as to whether the eastern black rail would benefit from designation, and without offering any reasoned basis for its decision, the FWS "ignore[d] the required procedures of decisionmaking" under subsection (b)(2). *Bennett*, 520 U.S. at 172.

The Court, accordingly, concludes that the FWS's "not prudent" determination violated the statute.

3.    *Remedy*

Having determined that the FWS relied on a misinterpretation of the ESA and that it failed to adhere to the statute's procedures for reasoned decisionmaking, the Court is left with the question of the appropriate remedy.  Plaintiffs aver that the FWS's ultimate decision was unsupported by the record, *see* Dkt. 11 at 23 (Am. Compl. ¶¶ 116–121), and so Plaintiffs ask the Court to direct the Service to propose and finalize a designation of critical habitat, Dkt. 33 at 43. In light of the procedural nature of the FWS's errors, however, the Court concludes that the appropriate remedy is to vacate and remand the FWS's decision for further proceedings.  *See Gerber*, 294 F.3d at 186.  The FWS must apply the ESA consistent with this opinion, but the Court will not direct the FWS to reach any particular conclusion on remand.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Plaintiffs' motion for summary judgment, Dkt. 33, and the Court will **DENY** the FWS's cross-motion for summary judgment, Dkt. 35.  The FWS's decision to not designate critical habitat for the eastern black rail will be **VACATED** and **REMANDED** for further proceedings consistent with this decision.

A separate order shall issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  July 11, 2025